Steven Shapiro on behalf of defendant Ha-Young Song, appellant Ha-Young Song, thank you and good morning and thank you for holding oral argument today. Obviously I'm not going to go over the facts of the case but I would like to touch upon what I consider to be the threshold issue in the case. May I do that? Sure. Sure. Okay. We know from the facts that my client was summoned into an office, a military office for an interview. The interview is something known in the military parlance as a counter-intelligence interview. At least that's what my client... Excuse me, timer's not on. There you go. That's okay.  Sorry. That's all right. Summoned to an interview. To an interview. To an interview. And my client's understanding of the interview was that it would be some kind of a counter-intelligence routine interview. It's normally done once a year. So he goes to the interview and they start chit-chatting a little bit and the interview took a major turn when a special agent, Syrian, who's the one conducting the interview, asked about Mr. Song's relationship with Ms. Kim, another military person. There was an accusation that he had committed a sexual assault on her. Once that happened, Mr. Song exercised his right to remain silent and requested an attorney, which of course should not be held against him. But at that moment in time, Mr. Song became aware of an investigation and that obviously got his attention. Mr. Special Agent Syrian asked Mr. Song to give his phone over to the military. It already had been locked up in a separate locker and Mr. Song said no. And the reason why Mr. Song said no is, I don't know if he said this exactly, but he just did not want to open up his entire life to the military. Your phone contains your entire life, as we know these days. Mr. Song was concerned that there would be exculpatory information that would disappear. That somehow the military would lose his phone and he wouldn't be able to defend himself. And of course, his refusal to give the phone over is, again, not an admission of guilt. The Army had the videos from Private Kim, first class Private Kim. They could have obtained it from multiple different sources, the contents of Mr. Song's phone. They did not. Instead, they persisted on asking him to relinquish his phone. The threshold issue, I believe, in this case is that there were no exigent circumstances in this case until Mr. Song was put on notice that there was an investigation. And that's important because the government contends that, oh, well, he could have done away with all the information, the photographs and the videos, by pressing a button, which still is beyond my comprehension, but I don't think it could be done that easily. There was no... You're right about that. We had another case on that. Thank you. Really, there was no legitimate fear of imminent destruction of the phone or its contents. Mr. Song did not consent to the seizure of the phone. As I said, the Army could have subpoenaed all the data very easily. They did not. Didn't he offer to show them some of them? Yes. Yes, he did. And the purpose of doing that was not to open himself up, hey, look, I'll show you the videos of Private Kim and myself, and that would satisfy your interest. Here they are. He felt that the videos themselves would have exculpatory information on it, and they did, because there was one video where she was laughing toward the end of it. I think that was one of the exculpatory factors. There are probably others as well. In any event, they never charged him for that, did they? You're correct, Your Honor. They did not charge him with that, but what they did was they decided to obtain a subpoena. I mean, they obtained, I'm sorry, a search warrant, or in the military parlance, a search authorization. And that's where the problems begin. But let me just say— Well, let me ask you this. So was there anything about the interview itself that was a Fourth Amendment violation? No, I don't think so, Your Honor. I don't think so. I know that at one point in the interview, Mr. Song was detained for a while in a separate room where presumably Special Agent Sirian was attempting to get a warrant. Now, mind you, Special Agent Sirian attempted to get a warrant on several occasions. He could not get in touch with the military magistrate. Why the magistrate didn't call him back? I thought I was searching the calendar to see if it was a federal holiday, but it wasn't. That's a good point. I frankly did not check the calendar. Well, it didn't appear to be. Okay. Well, in any event, you know, I have to believe that the military has plenty of magistrates, and I know they do, and it's on a website where they have multiple magistrates at any given time. Special Agent Sirian wanted to take a shortcut. What he did was, okay, I can't get a warrant. Now, I'm going to go in, and I'm going to have Mr. Song come in, and I'm going to interview him. You know what I'm going to do? I'm going to take his phone from him. So what's your best case for the proposition that him doing the interview that then leads to Mr. Song knowing about this rape investigation was improper, was a violation of something? What's your best case on that? Okay. Well, you know, the Fourth Amendment protects our privacy rights, as you know. There are—you must have a warrant, or there must be exigent circumstances, like I pointed out. Mr. Song was not aware of exigent circumstances until he suddenly knew that he was under investigation for sexual assault, and at that point— I'm asking you to cite a case. Oh, to cite a case that— That's what I mean by case. Cite a case. Oh, I'm sorry. I didn't understand. My apologies. On Lexis or Westlaw, you know, a case. I thank you, Your Honor. I'm sorry. I didn't understand. Okay. I don't know that there's a case directly on point. I can just give you general principles that once—the military says there were exigent circumstances in this case. We had to get the phone. We needed the phone. If we give it back to him, he's going to erase the phone. But before that, there were no exigent circumstances. There were only exigent circumstances when Mr. Song knew he was under investigation. Well, they could have gotten a warrant even before they interviewed him, right? Because she had said that—the alleged victim had said that he videoed what was going on, right? There could have been. And I don't contest that there was probable cause. But if he volunteers to give them the same information, he could have just emailed them the videos, right? I mean, what more— In a perfect world, it would be great to do that. I'm not sure that that would be the problem. Well, the problem is, of course, he can have video A and video B and just show video A, which helps him, and not show video B, which hurts him. That's the problem with him being in charge of showing it, right? That's what the government thought. Well, certainly that is a possibility. But I believe, and I think the record reflects this, that there was a finite number of videos, and Mr. Song was prepared to show the videos to— Well, but of course, the fine idol, how much they know that, how much they know what he's done with it, you know, he's moved things around and so on and so forth. I mean, the problem is that if somebody has committed a crime, the odds that they're lower than just a person generally showing their phone, oh, look at my fun vacation, here it is, right? Well, I, you know, I have to agree, if something incriminating, you're just not going to turn it over, you're not going to email the videos to the military. So that's the problem. In terms of relying on his voluntary showing of videos, they were concerned what else might be there, so that's why they wanted to get the phone. Now, I understand nobody likes turning over their phone, I respect that, but that was the situation. My understanding, Your Honor, is that Mr. Song was trying to be as cooperative as he could, and by showing the phone, I think in his own mind he was thinking, okay, let me show you, I'm under investigation for sexual assault, let me show you the video. You don't have to— But it's a little hard to believe he's trying to be cooperative when he knows turning over the phone would lead them where it did. Well, the military already had videos from Private Kim, so I think what they were trying to do was see if the videos were one and the same, and he was attempting to do that. I have to believe that it was cooperation, he wasn't waiving any rights, he was trying to cooperate. Well, wasn't he cooperating to restrict the discovery to that particular instance, and to avoid any inspection of the phone because of the child pornography that was on there? He was—no, he was not cooperating, and at that point he was certainly well within his rights not to cooperate. He exercised his right to remain silent, and he wanted an attorney. That doesn't have a lick to do with their getting the search warrant later, I mean, in other words, they're not holding against him that he took the Fifth and didn't want to comment further. So that's not an issue, right? My problem with all of this, Your Honor, is that they certainly could have gotten a warrant. There was definitely probable cause, there's no question about that, I have no—I did not contest that, anything. They could have gotten a warrant. This special agent Syrian decided, wow, I'd better bring in—I can't get a warrant in two, three times. But you said this was a regular interview. Well, right, but it came out later in the testimony that he had to—he was trying to get a warrant, and he wanted—Mr. Song— Okay, but what I'm saying is this was a regular interview he was coming in on, and so the military was wanting to try to pursue this issue of the rape charge. Right. Which is not surprising. Mr. Song did not understand that this was going to be an investigation, is what I'm trying to say. The military people knew. Special agent Syrian knew about that, but not Mr. Song. It was only when he was confronted with Private Kim, the discussion about Private Kim, that got him nervous, and he decided, oops, you know, I want to take the Fifth. He did attempt to cooperate, say, here's—this is my relationship with Private Kim, and I believe it's exculpatory. He wouldn't have volunteered—he would not have volunteered that had he thought that was incriminating, is my thought. So I respectfully say that—oh, and this is one thing I wanted to mention, too, about the exigent circumstances. It's very important. I really do think this is a threshold issue in the case, notwithstanding the warrant, which I know we're going to get into, but the government, through the Army, Special Agent Syrian created the exigent circumstance, and our Supreme Court has said if law enforcement creates an exigent circumstance, then that's no good. I mean— But they say that only if that's a—if they violated the Fourth Amendment in doing so, not just in general. Well, my understanding—I think the case was, if I'm not mistaken, Kentucky v. King, 2011. Yeah. My understanding of the case is that as long as you—if law enforcement creates an exigent circumstance, they've created it. They created it. How can there be real exigent circumstances? So you say that the order to this Agent Syrian to get off of the Song case and get on to another child endangerment case was somehow a pretext? Do you have any evidence of that? No, I don't. I think that came later, and certainly—and this goes into the three days. Why did he wait three days to get a warrant? Well, the Special Agent Syrian claims, oh, well, I was called off this case to work on another case. Well, if the phone was so urgent, why didn't he go right away to a magistrate and get a warrant? It can't be that difficult. You can pick up the phone. And he could have gotten a preauthorization in this case. Was there evidence presented that it was easy to get a magistrate judge in the military? I believe there was, yes. Can you cite us to that? I wish I could. Maybe on your rebuttal? Oh, yeah. I'll try. I can't guarantee it because I'm not sure with the record. I know I cited it to the record on appeal. But in any event, what's troubling is that the government created the exigent circumstance. The government should not enjoy the benefit of that. The evidence ultimately found child pornography on Mr. Song's phone should be excluded—should have been excluded by the district court. That did not happen. To me, that puts an end to this. Was that— It's a plain view exception, applying to evidence on telephones and computers. Plain view as far as looking inside the phone? It's an excellent question. And I've been preparing to answer that question for a while now. I don't think anything on a phone, search of a phone, is subject to plain view. And I'll tell you why. With one exception. If somebody has a warrant, somebody gets—somebody—a traffic stop says, I want to look at your phone. We now know from Riley, you can't just search the phone. You've got to get a warrant. OK? Get the warrant. Like that. OK, now I'm going to look through the phone. What am I going to do? I'm going to pick up the phone, and I'm going to look through it, and I'm going to— Wait a minute. Let me see if—what I want to see is photographs. OK, I go to photographs. Hmm. OK, now I'm looking at all the photographs. Whatever you're stopped for, well, it may be drugs. Hmm. There's—oh, there's a bag of cocaine. OK? That would be in plain view. Now, if you're looking for cocaine, and all of a sudden, uh-oh, I see child pornography. That's plain view. That's classic plain view. And in the context of this device, which is very complicated, our whole lives are on here. If you go into the phone, and you carve out images, and I explained that in my brief, what the carving out process is, we have a problem, because— OK, well, you have a problem in that your red light went on a minute ago. OK, I was trying to get into it. Well, you can get into it on rebuttal. OK. Thank you. Mr. Fowler. May it please the Court, Charles Fowler for the United States. I'll start with the warrantless seizure of the phone, which the government believes was justified by the Exigent Circumstances Doctrine, and then I'll move on to the warranted forensic search. Starting with the Exigent Circumstances exception, Kentucky v. King controls here and requires a ruling in the government's favor by establishing that the government, the agent, excuse me, only impermissibly creates the Exigent Circumstances if his conduct violates or threatens to violate the Fourth Amendment. I believe Mr. Song's counsel has, I think, pretty much clearly conceded that the interview itself did not violate the Fourth Amendment, and I think that's undeniably true. There was nothing about having this active service member come in for an interview that violated or threatened to violate his Fourth Amendment rights. So even if he wasn't aware— What about this constant statement of it would have been easy to get a warrant or whatever? What is your response to that, that there's all this evidence that it would have been easy, just get on the phone, you didn't do it, period, end of story? Kentucky v. King disposes of that argument, too, by rejecting the argument that the police, in that case, impermissibly created the exigency by doing a knock-and-talk when they had enough evidence to get a warrant. Basically, that's Justice Ginsburg's dissent in Kentucky v. King. Look, if there's no good reason not to proceed with a warrant, then they should be proceeding with a warrant. The majority rejects that and says we're not going to say you have to get a warrant if you've got enough evidence. There may be legitimate investigative reasons to try some kind of a consensual investigative technique first. We're not even going to require, quote, good police practices, which was one of the arguments, one of the alternatives that had been urged in Kentucky v. King. Well, was there evidence that it's easy to get the magistrate and so on within the military? No, I don't think so. The evidence is the agent the morning of the interview tried to get a warrant. He called the magistrate on duty, and then he called a second magistrate that he had a personal, already had personal knowledge of from a prior case. He heard back from neither of them in time and then proceeded with the interview thereafter. I don't think there's anything in the record one way or the other on whether that would usually work or whether that would, whether that process is easy in particular. It's certainly established in the record that there's. And it was a traditional interview setup. Yes, as far as I know. I mean, I don't think there's, I don't know that that characterization is necessarily in the record, but as far as the. It's not contesting the interview setup. Correct. That is correct, Your Honor. When soldiers are called in for these counterintelligence interviews, is it a routine matter to take their cell phone and lock it up in a safe? Yes, Your Honor, and that is something that Agent Sirian testified to. You're always separated from all of your personal property, not just your cell phone. Your wallet and everything. Wallet, anything you've got on you goes into the locker, so. And you know that in advance. That's my understanding. You don't have to bring your phone or your wallet. That's interesting. I'm not sure. Probably just your ID, but you don't have to bring your stuff with you, do you? That's probably right, although the record doesn't say one way or another, so I don't really know the answer to that question. But regardless, to touch on just kind of briefly some of the arguments that have been made why the circumstances weren't exigent, there was certainly probable cause to believe that if law enforcement already had a 25-second video of this event, if that's on there, there's at least a reasonable probability there's something else on there, too. Why? I'm sorry, Your Honor? Why? Because the claim had explained that he had his phone out and was moving it around like he was taking video, and so I think there's, again, at least a reasonable probability if there's one video and it's the one he was willing to send to the complainant. And rape usually takes longer than 25 seconds. Perhaps. I mean, he might have said he's videoing at some point, but then at other points not said it but still doing it. Sure, I think that's it. I mean, phones can be kind of hidden and so on and so forth. Well, we know he was not entirely upfront about what he was doing with his phone because at least according to the complainant, he said he was taking one photo. She said, you can take one photo, that was her claim, that doesn't show my face, and later he reveals to her he had, in fact, taken a 25-second video. So I think there's, again, at least a reasonable probability to believe there's more there. And the notion that you should take his word for it, that he's volunteering to show you everything relevant, the Seventh Circuit actually addressed, I think not concisely, I believe it was Judge Easterbrook in Bishop 2018 cited in our brief and said basically if a suspect offers to tell you where all the relevant files are on his phone, you'd be a fool to believe him for the very reason that if the suspicions that he's engaged in this sexual assault are correct, he's got every incentive not to reveal that to the police. So that's the initial warrantless seizure. It's justified by the exigent circumstances. Well, at some point tell us about how the search was within the scope of the warrant because I don't remember, it's something like 50 or 60 images, is that what they found? That is what was found. It was 60 videos and 50-something images, I believe. That was in the second warrantless search. I understand that, but when they located that to begin with, weren't some of those already deleted? It's not entirely clear from the record that something was deleted. What the testimony is is that the thumbnail image that initially triggered the examiner to stop searching for sexual assault evidence and get a second warrant for child pornography evidence, the testimony is that was a cache file, which is basically a file that for some reason because it was a temporary file or because it possibly had been deleted, something like that, doesn't have date metadata on it. Many of the files, and this is what the examiner testified to at the hearing, many of the files have a date associated with the file in the metadata, and that's where the examiner started. So once he got the first warrant... Yeah, he was looking for a particular date. Yes, Your Honor. He started with a 10-day date range that started one day before the incident and went the day of the incident and then 10 days thereafter. I think that was a very reasonable targeted way to do that given that the complainant had said not only that this incident happened, but they had exchanged messages, including messages about the incident itself, both before and after. And during his search within this date window, he found a few things that were relevant. He found, one, a message in the cacao message application data, and that's the messaging application that the defendant and the complainant had been using to talk to each other. It's similar to a text message type application. It appears to allow some sharing of media files as well. So it's just a third-party application that's similar to text messaging. And what the examiner's testimony was, and this is all in the record from around 381 up to about 395 is where he explains this process. He found where the suspect had sent a hyperlink to the complainant, but the link didn't work anymore, and he believed that what that link really was was a file of some kind. So that was one thing he found in the targeted date window where he was searching for messages, photos, and videos. The other thing he found was a couple of video files that appeared to be related to the incident. What he didn't know was which one of these files, video files, media files, were the ones, which one of them, if any, were the ones that were associated with that hyperlink that the suspect had sent the complainant in a cacao message. And so from there he set out to associate the relevant files he'd found with the relevant message he'd found, and that's how he found himself looking through a gallery of thumbnails including cache files and possibly deleted files, what he described as files from databases, because he believed... That's a general search as far as I'm concerned. If you send a hyperlink to somebody, you've already received the hyperlink or created it, right? Yes, Your Honor, in the sense that I think it's just the way this particular application works, where he would send it to her and she would open it and it would be the media file. Well, that's wonderful, but, I mean, you can't send... What you're sending is not the original. It's a copy of something that's already there, right? Yes, I think that's... Well, so it was either there or it wasn't there. So going into everything else that's on the cell phone or all the media images or whatever that are on the cell phone, just to find out a particular hyperlink, it seems to me is unnecessary. Let me back up a little bit and start with sort of first principles for searching cell phones. Well, first principles for searching cell phones, according to the government, seems to be, and we've had a number of cases at this point, whatever we can see, whatever, you know, Well, I think it's a little more targeted than that, and here's what I think the law is. If you have probable cause that there's evidence on a cell phone or a similar digital device, the warrant is sufficiently particular if it specifies the device and it specifies the matter under investigation. That's what this court held in 2012 in the triplet case with respect to computer files. We had an en banc case about this as well. I'm just saying that this is becoming a routine sort of thing, seems to me. It's just, I mean, it's really quite analogous to, well, we found a marijuana, we found a distributable amount of marijuana on the person of this individual and therefore we're going to search his entire apartment. Well, I think there are two issues, Your Honor. One is whether this warrant is particular enough, and it is if it specifies the crime because that gives Well, I don't disagree with the specificity of the warrant in this case. Right, and from there the question becomes did the agent stay within the scope of the warrant, and I think what this court said in triplet, and this is not something that the court reached in the Morton case, the en banc decision from last year, which was decided on good faith grounds, which I also believe apply here, but before getting to good faith, the question becomes was the agent engaging in a reasonable search protocol, reasonable forensic steps to search for what's specified in the warrant, and that is the position that I think, again, this court took in triplet. A number of other courts have taken with respect to cell phones. I mentioned the Bishop case from the Seventh Circuit recently, and the principle that these courts keep articulating is, look, depending on what the evidence specified in the warrant is, depending on the context, it may indeed be necessary to do a pretty deep dive on the phone, and that's fine as long as the forensic steps the agent is taking are reasonably targeted, reasonably intending to locate the evidence in the warrant, not just go. So the fact that there's a hyperlink means, I mean, this is probably barking up the wrong tree, but the fact that there's a hyperlink is basically a clue, and that enables him to search through everything. Well, I don't think it necessarily enabled him to search through everything, but I think on the facts here, it enabled him to take another step because he had a message that he didn't know. Because the link no longer worked, he didn't know what exactly was sent, and then he had some stuff he thought it could have been, and so that enabled him to take the next investigative step. A hyperlink means that it's some image, right? Or is it text? It was his understanding that when the complainant received that link originally, she would have clicked on it and it would have opened up a file, a photo or a video file. A video, right, because if it was text, he would have just texted her. So that's some kind of video file. But what I'm saying to you is that that individual video is still somewhere in that 10-day range, right? Yes. The problem from the examiner's standpoint was that he didn't know which video it was, and it was relevant to the investigation to determine which one it was. Well, it could have been, yeah. I don't understand that. And he believed that the next step in the investigation was to review something, some undated files to try to figure out, to try to draw a connection. And he was not, and I think this is important. If anybody had asked the complainant, they could have said, so did he send you a text on such and such date with a video file? Oh, yeah, here it is. Perhaps. What do you mean perhaps? Well, I think that she may have been able to explain. I don't really know. But here's one thing I think is really important that is in the record. This is at page 385, repeated at 391, and then the district court made a specific finding on it at 1356. Whatever the examiner was doing, he was looking for evidence of the sexual assault, sort of avoiding the weeds of exactly what he was doing, taking a step back. He was not looking for child pornography, and I think that is a. . . He had no idea that was going to come, right? There wasn't any indication, oh, let's pretend we're looking for the rape, but we'll go look for the child porn. He was just trying to do this, and boom, there it was. Yes. That's your statement. And unlike in some cases, in fact, there's no evidence whatsoever that any of this is just a ruse or a pretext to look for child pornography. Nobody had child pornography on their radar until here the examiner is, going through his forensic steps, and, oh, I recognize this image because this is a known image of child pornography that he'd seen before. So that was. . . Beyond the hyperlink, did he open the video to watch the video? He tried. . . That's why. . . He tried and was unable to. So he tried to open the hyperlink, and it didn't work anymore. So that was why he took the next step to try to go, oh, okay, now I need to take another forensic step to try to find what this would have opened up if it still worked. And so just to briefly touch on, I think in terms of the scope of the warrant, Morton controls on application of the good faith exception. I think this case is at least as strong on the good faith exception with respect to the warrant as Morton was because unlike in Morton, where there was perhaps a, at least according to the defendant, a mismatch between the crime for which probable cause existed, drug possession, and the crime that implicated the cell phone drug dealing, the defendant said there was a mismatch, and the original panel agreed. Here in contrast, the search warrant affidavit places the cell phone squarely in the middle of the alleged sexual assault, literally involves it as an instrument of the crime, and so there's at least the agent could reasonably have. . . May I ask a, let me ask a question. I know this is not raised here, but this fellow was sentenced to nearly 15 years in prison, right? Yes, Your Honor, really 170 months. Right. And we had another case recently where the investigators, not military, but other investigators found 10,000 images including, as the descriptions were, very, very grotesque things that this person had been collecting over a period of at least 15 years, and that person got 90 months. I don't really, I mean, I'm not familiar with that case. That is a shock, I know you're not, because it's in the Southern District, but that's a shocking disparity, don't you think? I know, Your Honor, that in this case. . . They're not challenging that. The guidelines range, this sentence represented a major downward departure from the guidelines range. Well, it was, as you can imagine, it was a huge departure in the other case. I suspect it was.  Correct. He's not challenging the sentence. I'm allowed to ask some questions. I'm just commenting on the fact that there are grotesque differences sometimes. Well, I just wasn't making sure I hadn't missed something. No, you are correct that the sentence is not being challenged. Okay, thank you. All right, thank you, sir. Mr. Shapiro, rebuttal. Thank you, Your Honor. And we have five minutes, so I'm going to try to keep this as brief as I can and without being loquacious, as I sometimes am. I want to bring to the Court's attention the scope of the warrant. The warrant, and I can't read it, it's too long to read, but it does say call logs, text, contacts, SMS, videos, images, application data. So it does talk about a finite bunch of categories of information. But there are problems. Number one, Cunningham, who was the one that did the forensic search, unilaterally decided that he was going to use a 12-day timeframe, and I believe it was from supposedly the date of the incident, six days and six days. The problem I have, the big problem, I think the Court will have a problem with this too, is that the search warrant doesn't say anything about dates, nothing. And when you look in the affidavit, assuming that you accept the affidavit as part of the warrant, there is not a date there. I don't see it. I reproduced it right here. I don't see a date. I looked at the original. I don't see a date. This is important because what happened in this case is that, number one, he exercised his own discretion to do that. Nobody gave him the authority to put a date on it. Somehow he miraculously knew the dates, which leads you to believe that he might have been referring to something else. And he has to follow what the warrant says. He should not be looking at other items to justify his search. The date isn't. What in the warrant precluded him for the original search, what he started with these 10 days, what precludes that? Nothing precludes it and nothing authorizes it. Well, what he's got to look at something. I understand. So please explain how it's clear from the warrant that he's not supposed to do the 10 days. Okay. I'll do my best to explain. There is testimony to the fact that, from the government, that the search warrant adopted incorporated by reference the affidavit. Insofar as it talks about the incident, the incident complained of, I am, it boggles the mind. I'm looking at this. I don't see a date. I still don't see a date. I don't see a date restriction. I don't see something. Well, then that actually would make him able to search more. I don't understand how that helps you. It helps me because he took it upon himself to do that. This is, he's supposed to follow what the warrant says. He can't just go out and say, oh, I'm going to look at this memo. Oh, this is the date. Oh, great. I'm going to use this date. I'm going to go six days. Where does the 12 days come from? That's the other thing. Where? Why not look at the date of the incident, not the 12 days? He expanded that. Well, I think the complainant said they engaged in back and forth after this event, and he said he would, she was concerned that he would reveal photos of her, something like that. Well, I. . . So there was definitely a requirement to search after the event. After, but what about before? The date, the time frame disturbs me because he took it upon himself to do it. He's not supposed to do that. Well, the. . . I mean, do we have any information that anything incriminating came up before the event? Not that I know of. I think that that was the incident and that was it, and he did the search. Let me point out something. This gets technical, and I only have a minute, six seconds left, and I'm trying my best. This examiner did something called he carved out a file, and I put that in my brief. He carved out a file. What does that mean? It took me a long time to understand it, to be honest with you. But carving out a file is, picture a rectangle with tiles on it all across it. Each tile has a number, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10. When something is deleted, the number goes away. The tag goes away. The number goes away. It becomes raw data, and nobody can access it, unless you try to carve out the file. The problem we have with that is that there is no date on it. There is no date on this particular piece of information, and we don't have any dates here anyway. There's no date. He could look at everything that was possibly deleted on the phone, including medical information, sensitive other information, what have you. He did this. He did the carving. He took it upon himself. I'm going to carve out. Okay, your time is up, but the point is you're saying that if you carve out and something is cached somewhere, the carved out file has been cached, that in looking for that, you encounter all the other trash in that area. Is that what you're saying? I think, yes, you find things that are not there. It's indiscriminate. Exactly, and not only that, you're looking at there is no way to tell who has actually viewed it. There's no way to tell who has actually viewed it. It's in the cache. Right. But it could have been from that date. Possibly. Yes, okay. There are cases where there's somebody's. I'm sorry. I don't need a long answer. The answer's yes. Okay, thank you. All right, thank you very much. Appreciate it. Thank you.